UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | CRIMINAL ACTION NO. |
| | ) | 10-10388-DPW |
| v. | ) | |
| | ) | |
| JAMES C. FIELDS, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM
January 19, 2016

## I. BACKGROUND

James Fields was CFO of LocatePlus, a business providing online access to public records and other information for a fee. The government charged that Fields, in conspiracy with his codefendant LocatePlus CEO Jon Latorella, sought to inflate the stock price of LocatePlus artificially by deceiving the public about the financial health of the company.  He also was said to divert company funds to his own uses.

The scheme involved inflating LocatePlus receivables by recording debt from a fake company called Andover Secure Resources and by recording inflated revenues from a fake contract with a fake company called Omni Data.  The Omni Data fraud was funded in part by a public offering of stock in a company called Paradigm Tactical Products, which involved false SEC filings and false public statements.

A jury found Fields guilty of conspiring to commit securities fraud (Count 1), and engaging in or aiding and abetting:  securities fraud (Count 2), material omissions and false statements by a corporate officer to an accountant (Counts 3-10), false statements in required SEC filings (Counts 11-19 & 27), wrongful certification by a corporate officer (Counts 20-26), aggravated identity theft (Count 28), and a monetary transaction in property derived from unlawful activity (Count 29).

In connection with sentencing, I confronted an array of post-conviction motions:  a motion to dismiss based on due process violations (Dkt. No. 351), a renewed motion for judgment of acquittal (Dkt. No. 354), and a motion for a new trial (Dkt. No. 356).  I informed the parties orally that I was denying the motions except to the extent of granting a judgment of acquittal regarding Count 28, the aggravated identity theft charge.  I promised that a fully reasoned written opinion regarding the issues would follow.  This is that opinion.

## II. MOTION TO DISMISS

### A.   *Prosecutorial Misconduct*

Fields alleged that misconduct by AUSA Victor Wild led to a violation of his due process rights.

One set of allegations involved Wild's involvement with penny-stock company Evermedia.  Wild served on the Board of Evermedia, which retained Blake Godbout and Geoffrey Chalmers as counsel.  Godbout and Chalmers, in turn, served as counsel to LocatePlus in civil litigation against Fields.  In addition to conflict of interest problems, Fields' attorney Barry Pollack asserts he received indications from Godbout in April 2009 that Wild had disclosed to Godbout information about the grand jury investigation into Fields, in violation of Fed. R. Crim. P. 6(e).  Fields also alleges that Wild facilitated violations of 18 U.S.C. § 207 by meeting with Ken Kaiser, who participated in meetings with the FBI on behalf of LocatePlus after having recently retired from the agency.  *See* 18 U.S.C. § 207(c) (prohibiting a former federal employee from appearing before his former agency, regarding matters that were pending under his authority, within a year of leaving federal service).[1]

---

[1] On July 3, 2009, the day he retired from the FBI, Kaiser became employed by LocatePlus as a consultant.  Over the next year, he held various positions with that company, in which capacities he arranged and participated in meetings with FBI personnel.  A misdemeanor information was lodged against Kaiser under 18 U.S.C. § 207(c).  *United States* v. *Kaiser*, 13-cr-10264, (D. Mass. Sept. 13, 2013).  Kaiser pleaded guilty to the charge, and on December 17, 2013, Judge Stearns sentenced him to payment of a $10,000 fine.

Beginning in May 2007, Fields participated in a series of proffer sessions with the government, apparently in hopes of obtaining a plea deal as a cooperating witness.  Fields alleges, however, that once Pollack confronted Wild about the potential improprieties discussed above, the government turned its attention to using co-conspirator Dan O'Riordan, VP of operations at LocatePlus, as a cooperating witness.  Fields complains that, despite what was far less actual cooperation by O'Riordan--a single proffer session in December 2009, years after Fields began cooperating, that provided little new information--O'Riordan received a favorable plea arrangement.

Fields faults Wild for failing to reveal various relevant details at O'Riordan's sentencing before Judge Wolf.  For example, Wild represented to the court that O'Riordan had been fully cooperative with the government "from the very beginning." He failed to disclose, however, that O'Riordan had perjured himself before the Massachusetts Securities Division in 2006 and subsequently relocated to Texas.  Wild also failed to reveal the arguably more extensive cooperation provided by Fields.  As a result, Fields argues, Judge Wolf sentenced O'Riordan to 6 months of imprisonment, below even the 2 years of imprisonment recommended by the government.

The plea deal offered to Fields shortly before his trial, meanwhile, required Pollack not to advocate for a sentence of less than 4 years of imprisonment.  This, Fields says, violated the spirit, if not the letter, of 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Fields suggests a variety of remedies for the alleged misconduct, including dismissal of the indictment, dismissal of the counts on which the government relied most directly on the testimony of O'Riordan to obtain convictions (Counts 1, 27, and 28), or requiring the government to re-offer its plea deal to Fields without the limitation on advocacy as to a particular term of imprisonment.  Fields requested, at the very least, that I hold a hearing on these matters to determine the appropriate course.

I begin by noting that the plea deal offered to Fields did not violate 18 U.S.C. § 3661; limiting a defendant's advocacy as to a specific sentence length is quite different from withholding information from the court.  Neither did the plea deal between the government and O'Riordan violate 18 U.S.C. § 201(c)(2).  The improprieties suggested by Fields, even if true,

do not indicate that the government went so far as in effect to pay O'Riordan for false testimony, *cf. United States* v. *Singleton*, 165 F.3d 1297, 1302 & n.2 (10th Cir. 1999). Moreover, a promise of leniency to a cooperating witness does not violate 18 U.S.C. § 201(c)(2), *United States* v. *Lara*, 181 F.3d 183, 197 (1st Cir. 1999). To the extent the alleged improprieties raised concerns about the reliability of O'Riordan's testimony for purposes of determining guilt or innocence on the charges against him, Fields had a full and fair opportunity to cross-examine him at trial and took advantage of that opportunity.

At bottom, Fields finds it unfair that O'Riordan received an attractive cooperation plea agreement while he did not. Fields attempts to constitutionalize the issue, relying on the Supreme Court's opinions in *Lafler* v. *Cooper*, 132 S. Ct. 1376 (2012), and its companion case *Missouri* v. *Frye*, 132 S. Ct. 1399, 1406 (2012). *Lafler* and *Frye* support a constitutional dimension to the plea bargaining process because "[t]he Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding," *Lafler*, 132 S. Ct. at 1385, and plea bargaining is one such "critical stage," *id.* at 1392; *see also id.* at 1388 ("criminal justice today is for the most part a system of pleas, not a system of trials").

The Supreme Court, however, long ago foreclosed the idea that there is an independent entitlement to a plea offer or plea bargain, the deprivation of which might be the subject of due process scrutiny.  *See Frye*, 132 S. Ct. at 1406 (citing *Weatherford* v. *Bursey*, 429 U.S. 545 (1977)); *see also Weatherford*, 429 U.S. at 561 ("[T]here is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial.  It is a novel argument that constitutional rights are infringed by trying the defendant rather than accepting his plea of guilty.").  This makes sense from a separation of powers perspective.   Having courts scrutinize these matters would intrude on executive prosecutorial functions in a way that scrutiny of ineffective assistance of defense counsel does not--even if the remedy for ineffective assistance is similar to one of Fields' suggested remedies for unfair dealing during plea bargaining.  *Cf. Lafler*, 132 S. Ct. at 1391 (proper remedy for ineffective assistance in advising defendant to reject plea was requiring government to re-offer plea).

In the final analysis, Fields presented a tale of some questionable intrigue, but nothing that amounts to a violation of due process or indicates that he failed to receive a fair trial.  I do not ignore the generalized allegations of misbehavior by Wild, which if substantiated with particularity

7

might be the basis for contempt proceedings, *see* Fed. R. Crim.
P. 6(e)(7) (specifying contempt as remedy for violations of
grand jury secrecy), or other sanctions.  The alleged conflicts
of interest presented by his involvement with Evermedia, for
acquiescing in Kaiser's violation of 18 U.S.C. §207(c), or for
his alleged withholding of information at O'Riordan's sentencing
might, if substantiated, also lead to sanctions.  That said, the
allegations are not sufficiently supported in the record before
me.  The evidence of Wild's alleged disclosure of grand jury
information references nothing more than the type of generalized
topics of discussion, common and not inappropriate among
representatives of the government and representatives of the
changing cast of characters in fraud investigations who may be
cast alternatively as victims, subjects or targets.  The
question of culpability in Kaiser's criminal conduct is a matter
for charging decisions by the Department of Justice.  Moreover,
Wild's alleged omissions at sentencing were of relatively stale
historical information.  Given that O'Riordan's perjury at the
Massachusetts Securities Division in 2006 substantially predated
the federal grand jury subpoena served on him in September 2009,
at which point it was accurate that he was fully cooperative
with the government, any omission seems relatively *de minimis*.

The allegations — even as generalized allegations — were
nevertheless serious enough that I have, as I earlier indicated

8

to the parties I would, considered referring the matter to Judge

Wolf, who dealt directly with AUSA Wild in the prosecution of

O'Riordan.  After considering that initiative, I have determined

not to make such a reference formally.[1]

More pertinently to the motion presented to me, the alleged

misconduct — even if substantial and fully substantiated — does

not justify upsetting the verdict against Fields in a

prosecution handled by Assistant United States Attorneys other

than Wild, following a trial in which the government provided

ample evidence in support of Fields' guilt, and where the

government had legitimate (if debatable) reasons for

distinguishing between Fields and O'Riordan.  To the extent

questions remained about the relative culpability of Fields and

O'Riordan, and the extent to which O'Riordan's sentence properly

---

[1] In making this determination, I have followed a protocol
outlined by Judge Wolf for entertaining claims of prosecutorial
misconduct.  *See generally United States* v. *Flemmi*, 233 F. Supp
2d 113, 115-19 (D. Mass. 2000).  I do not find the allegations
sufficiently supported in evidence establishing a *prima facie*
case of misconduct on which action by me may be based.
Consequently, I decline to take further action than my
disposition of the defendant's motions.  In particular, I
decline to make a formal reference to Judge Wolf or any other
judicial officer or entity suggesting that there is a *prima
facie* case in the record before me of independently actionable
misconduct by Wild.  This determination, of course, does not
foreclose the defendant or his counsel from further marshalling
a record and continuing to pursue the matter (as the record
suggests they previously have, *see* Doc. 427-1 at 2 (June 18,
2013 Letter to Attorney Pollack from Department of Justice))
before Judge Wolf or some other responsible person or entity.

reflects his culpability, I essentially addressed such matters at sentencing so far as they concern the relative culpability of Fields.

## B.   *Brady Violation*

Fields also asserted that the government violated its *Brady* obligations by waiting until mid-trial to disclose the notes taken by agents in the course of witness interviews.  Fields argued that these notes revealed that Nicholas Bouchard, another finance department employee at LocatePlus, had an independent role in the fraud involving Paradigm Tactical Products.  Fields says he could not raise this issue without risking the credibility of counsel, however, because attorney Pollack had argued to the jury in opening that Fields' culpability was closer to that of Bouchard than to that of Latorella and O'Riordan.

Fields cannot establish that the evidence was material, as necessary to make out an actionable *Brady* violation.  *Kyles* v. *Whitley*, 514 U.S. 419, 434 (1995) (question is whether, in the absence of the undisclosed evidence, trial resulted in "a verdict worthy of confidence"); *Drumgold* v. *Callahan*, 707 F.3d 28, 38-39 (1st Cir. 2013) ("Evidence is material if there is a 'reasonable probability' that, had it been disclosed, the result of the proceeding would have been different.").  The isolated additional detail about Bouchard's role does not detract from

the evidence establishing Fields' role in the conspiracy.  To
the extent the information goes to the culpability of Fields
relative to his co-conspirators, it is another consideration
that was weighed at his sentencing, and was timely disclosed for
that purpose.

## C.    Proffer Agreement

Finally, Fields argued that the government improperly
threatened to introduce statements made in his proffer sessions.
The government, however, was permitted to raise the proffer
statements if Fields contradicted them at trial.  Fields cannot
complain that the government raised possible contradictions with
the court; there would be no other way to resolve whether Fields
actually contradicted himself.

Fields also complains about pre-trial disclosure of the
proffer statements to the court.  The government essentially
argues that Fields opened the door to presentation of his
proffer statements because they were used to support the motions
to sever made by him and Latorella.  In any event, even if the
government technically breached its promises under the proffer
agreement - and I do not believe it did - Fields has not
demonstrated how disclosure of the statements only to the court
affected the integrity of the indictment, the trial, or the
verdict.

### III. MOTION FOR JUDGMENT OF ACQUITTAL

Fields moved for judgment of acquittal under Fed. R. Crim. P. 29.  A judgment of acquittal may be entered "only if the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant['s] guilt beyond a reasonable doubt." *United States* v. *Mubayyid*, 658 F.3d 35, 47 (1st Cir.2011).  A trial judge "is not to weigh the evidence or assess the credibility of witnesses when [he] judges the merits of a motion for acquittal," *Burks* v. *United States*, 437 U.S. 1, 16 (1978), but must instead "take into account all evidence, both direct and circumstantial, and resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict."  *United States* v. *Valerio*, 676 F.3d 237, 244 (1st Cir. 2012).

### A.   *Aggravated Identity Theft*

Count 28 charged Fields with aggravated identity theft, 18 U.S.C. § 1028A(a)(1).  The statute provides that:

> Whoever, during and in relation to [certain enumerated felonies, including mail and wire fraud], knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

*Id*.  Here, the government alleged that Fields used the name, date of birth, and social security number of a deceased individual, Timothy Rodden, during and in relation to mail and

wire fraud, 18 U.S.C. §§ 1341, 1343.  The details of the scheme, in the light most favorable to the verdict, are as follows.

Fields and his co-conspirators undertook to employ a public offering of Paradigm stock to fund the Omni Data fraud.  In order to avoid SEC reporting requirements, they fabricated a number of "accredited investors" in order to avail themselves of a registration exemption available when securities are sold only to such investors.  One of the fraudulent accredited investors was a trust formed using Rodden's identifying information--the Rodden Family Trust.  Detailed investor information filed with the NASD in the Spring of 2005 also used Rodden's identifying information.  In early June 2005, Fields participated in filing a fraudulent Form D indicating that Paradigm had enough accredited investors to qualify for the exemption.  The Form D itself, however, did not include identifying information about those accredited investors.  In reliance on these materials, the NASD cleared Paradigm stock for public quotation in July 2005.

Fields moved for acquittal on Count 28 on various grounds.

1.   Timeliness

Fields first argued that the aggravated identity theft charge was time-barred.  By virtue of tolling agreements with the government, all agree that the charge is timely only if the relevant offense conduct occurred after June 1, 2005.  The dispute thus centers around whether Fields "used" Rodden's

identifying information after June 1, 2005.[2]  Fields argues that,
because the only documents actually bearing Rodden's identifying
information pre-dated June 1, his "use" of the information also
pre-dated June 1.  The government, however, argues that the
"use" continued after June 1 because (1) the Form D referenced
the fake accredited investors, which implicated the earlier use
of Rodden's identifying information to create the fake investor
trust; and (2) the NASD continued to rely on the documentation
bearing Rodden's identifying information until it approved
Paradigm stock for quotation in July 2005.  I find as a matter
of law that Fields used Rodden's means of identification only
prior to June 1, 2005.

     To "use" means to "put into service."  Webster's New
International Dictionary 2523 (3d ed. 1986).  It might also mean
to "apply to advantage" or "to carry out a purpose or action by
means of."  Id. at 2524.  Even the latter definition does not
necessarily mean, however, that "use" continues until the ends
are achieved.  Consider, for example, the most natural
characterization of "use" of a stolen credit card.  A

---

[2] It seems clear enough that Fields "possessed" Rodden's means of
identification after June 1, 2005, and this was "during and in
relation" to mail and wire fraud.  The parties appear to agree
that the disputed conduct charged in the indictment focused on
"use."  My instruction to the jury, although indicating that
aggravated identity theft could be achieved by transfer, use,
and possession, similarly focused on "use."

perpetrator "uses" the card--and identity theft thus occurs--
when he presents the stolen card or number for payment, not when
the credit card company finishes processing the transaction.
Any number of processes may be triggered by an identity thief's
use of the identifying information of another, but those third-
party processes do not constitute part of the use itself.

Similarly, Fields put Rodden's identifying information into
service when he used the information to create the fraudulent
accredited investor trust, and when he provided Rodden's
identifying information directly to NASD.  What the NASD did
from there may have been set into motion by Fields, but the
theft had already been perpetrated.  I reject the argument that
the duration of Fields' use depended on processing time
attributable to the NASD.

A closer question is the extent to which the reference to
accredited investors in the October 22, 2013 Paradigm Form D may
be deemed a "use" of Rodden's means of identification.  I
recognize that reference to the accredited investor trust was
only possible by virtue of the underlying use of Rodden's
identifying information.  In some sense, then, each invocation
of the trust re-deployed Rodden's identifying information by
incorporation.

There is no indication, however, that Congress intended to
reach such downstream conduct when it proscribed "use[]" of a

15

"means of identification."  To the contrary, the legislative history indicates that Congress sought to protect against abuse of "*personal* data."  H.R. Rep. No. 108-528 at 4 (2004) (emphasis added).  Accordingly, the statute defines "means of identification" to mean "any name or number that may be used, alone or in conjunction with any other information, to identify a *specific individual*."  18 U.S.C. § 1028(d)(7) (emphasis added).  Reference to the accredited investors generally on the Form D is a means of identifying the trust formed using Rodden's identifying information; not a means of specifically identifying Rodden himself.[3]

At the very least, without guidance from the text of the statute or reliable legislative history, and absent other countervailing considerations, principles of lenity militate in favor of a narrower construction of "use."  *See generally United States* v. *Jimenez*, 507 F.3d 13, 20 (1st Cir. 2007) (discussing application of rule of lenity in cases of "genuine ambiguity").

The government seeks to provide a countervailing consideration by arguing that "use" of identifying information,

---

[3] This is unlike a case in which another's social security number or passport are used to obtain a driver's license or credit card in the name of that person.  There, no downstream application of the initial identity theft is necessary.  The further uses of the fraudulently obtained license or credit card themselves independently constitute additional "uses" of another's "means of identification."

read narrowly, often will not directly coincide with a predicate offense.  Thus, the government argues, the narrow definition of "use" leads to absurd results by excluding obvious instances of aggravated identity theft from the reach of the statute.  Here, for example, the uses of Rodden's identity all occurred before the predicate offense of wire fraud was consummated by the transmission of the Form D in June 2005.  This argument, however, is out of focus.

The government confuses the relevant statute of limitations question with a question about satisfying a separate substantive element of aggravated identity theft--namely, that the "use" be "during and in relation to" the predicate offense.  Even under the narrow definition of "use," there is little question that the uses of Rodden's identity before June 1, 2005 occurred "during and in relation to" the wire fraud consummated after that date.

As the government observes, the "during and in relation to" language is "expansive." *United States* v. *Mobley*, 618 F.3d 539, 549 (6th Cir. 2010) (quoting *Smith* v. *United States*, 508 U.S. 223, 237 (1993)).  Avoiding the government's concern about the temporal relationship between identity theft and a predicate offense thus does not require reading "use" broadly to extend throughout the scheme to defraud.  Rather, even under a narrow definition of "use," identity theft may occur "during and in

17

relation" to wire fraud if the theft is part of the broader scheme to defraud and "facilitates or has the potential of facilitating that predicate felony." *Mobley*, 618 F.3d at 549 (internal quotation and citation omitted).

Here, NASD's reliance on the underlying investor list (including Rodden's name and DOB) and invocation of the accredited investors, both of which came after June 1, 2005, indicate the ways in which the earlier use of Rodden's identifying information was a part of and facilitated the scheme to defraud.  But the actual deployment by the defendant of Rodden's identifying information, prior to June 1, 2005, cannot be bootstrapped to later aspects of the fraud such that the aggravated identity theft charge becomes timely.

Thus, as this case reflects, defining the scope of "use" for purposes of the statute of limitations has little to do with whether the identity theft bears the necessary temporal relationship to a predicate offense.  "Use" of another's identity may occur "during and in relation to" a predicate offense.  But, because that "use" occurred so far in the past while the related scheme to defraud extended over a period of time, a charge of aggravated identity theft based on the actual "use" may be stale even if a charge based on the related predicate offense is not.

Judgment of acquittal therefore entered for Fields as to Count 28 on timeliness grounds.  For fullness of explanation, however, I will briefly explain my view that Fields was not entitled to judgment of acquittal based on the other challenges to his conviction for aggravated identity theft.

### 2.  Deprivation of Property

Fields attacked the predicate mail and wire fraud offenses, arguing that the government failed to prove a deprivation of money or property, but rather proved only a deprivation of intangible rights--a theory of mail and wire fraud precluded by *McNally* v. *United States*, 483 U.S. 350 (1987).  Fields might have had a winning argument if the government had merely charged a scheme to obtain approval for the unregistered public offering of Paradigm securities.  *Cf. Cleveland* v. *United States*, 531 U.S. 12 (2000) (fraud to obtain government license does not in itself constitute necessary deprivation of property).

The indictment, however, charged a scheme to

> illegally generate profits . . . from the sale of shares of Paradigm, by deceiving the SEC and others into allowing Paradigm securities to be publicly traded without being registered, and then by making false statements to the investing public to artificially inflate the price and sales volume of those securities.

Indictment ¶ 12.  Defrauding the SEC and the NASD was merely one step in the scheme to deprive the public of money or property through the sale of artificially inflated Paradigm stock.  *Cf.*

19

*United States* v. *Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived.").

Also, contrary to Fields' suggestion, the government was not required to show reliance or damages by any particular investor. *Neder* v. *United States*, 527 U.S. 1, 25 (1999) ("By prohibiting the 'scheme to defraud,' rather than the completed fraud, the elements of reliance and damage would clearly be inconsistent with the statutes Congress enacted.").

### 3.   Real Person

Fields also argued the government failed to show that he knew the means of identification at issue belonged to another person. *See Flores-Figueroa* v. *United States*, 556 U.S. 646, 657 (2009) (applying knowledge requirement across all elements of § 1028A(a)(1)).  I am unpersuaded.  Several of the fake trusts serving as purported "accredited investors" were formed using the identities of people Fields undoubtedly knew were real-- including his skydiving instructors and an ex-girlfriend.  The jury could infer that Fields would not have gone to the trouble of obtaining these real identities if he thought fake ones would suffice.

Moreover, Fields used Rodden's identity liberally--not only with respect to the Paradigm fraud where the information was

subject to scrutiny by the SEC and the NASD, but also in opening
bank and brokerage accounts used for stock sales that could have
prompted IRS scrutiny.  The willingness to subject the
identifying information to repeated scrutiny implies Field had
confidence that the information would withstand scrutiny, and
thus supports the inference that he knew the information
belonged to a real person.  *Cf. United States* v. *Valerio*, 676
F.3d 237, 244 (1st Cir. 2012).

A reasonable jury could readily conclude that Fields knew
Rodden was a real person.

**B.   *Duplicitous Counts***

Fields also sought dismissal of Counts 2 through 19, which
he argued were improperly duplicitous.  "[T]he prohibition
against duplicitous indictments arises primarily out of a
concern that the jury may find a defendant guilty on a count
without having reached a unanimous verdict on the commission of
any particular offense." *United States* v. *Valerio*, 48 F.3d 58,
63 (1st Cir. 1995).  Although the jury must "unanimously agree
on each element of the crime in order to convict," it "need not
agree on all the underlying brute facts that make up a
particular element." *United States* v. *Verrecchia*, 196 F.3d 294,
298-99 (1st Cir. 1999) (internal quotation, citation, and
modification omitted).  As did the parties, I consider
separately the arguments with regard to Count 2 and Counts 3-19.

1.   Count 2

Count 2 charged Fields with securities fraud, and incorporates the entire factual recitation of the indictment. Field argues that the incorporation of allegations related to the Omni Data transactions, Paradigm securities sales, and Andover Secure Resources debt renders the count improperly duplicitous.

The government had a legitimate argument that the indictment is not duplicitous because what Fields describes as separate offenses are actually part of a single, overarching scheme to defraud. *Cf. United States* v. *Wiles*, 102 F.3d 1043, 1062 (10th Cir. 1996) ("charging a single offense of securities fraud involving a multitude of ways and courses of action as a result of an ongoing scheme to defraud does not render that charge duplicitous"), *vacated on other grounds by United States* v. *Schleibaum*, 522 U.S. 945 (1997).

Regardless, Count 2 was narrowed to cover only the Omni Data aspects of the fraud, and I gave the jury a unanimity instruction.  These steps alleviated any concern about duplicity in the charge.  Because the indictment charged the narrower set of conduct, the change was at worst a variance.  *See United States* v. *Mubayyid*, 658 F.3d 35, 50 (1st Cir. 2011); *United States* v. *Celestin*, 612 F.3d 14, 25 (1st Cir. 2010); *United States* v. *Mueffelman*, 470 F.3d 33, 38 (1st Cir. 2006).  While in

light of the evidence, it may have been difficult for Fields to defend against the narrowed charge, this is insufficient to show that the variance caused prejudice such that Fields would be entitled to relief. *Mubayyid*, 658 F.3d at 54.

   2.   Counts 3-19

   The argument that Counts 3 through 19 are duplicitous warrants little attention.  Each count specifies the particular document alleged to be fraudulent.  That the documents may have been false or fraudulent in a variety of ways does not make the respective counts duplicitous.  *United States* v. *Goodwin*, No. 03-10197-RGS, 2004 WL 769312, at *3 (D. Mass. Apr. 12, 2004) ("So long as the jury concludes that the Forms 10-Q were materially false, and had the required connection to the purchase or sale of securities, it little matters whether jurors attribute the falsity to transaction (a), (b), or (c), or all of them."); *see also id.* ("The crucial distinction [in matters of jury unanimity] is . . . between a fact that is an element of the crime and one that is 'but the means' to the commission of an element.") (quoting *United States* v. *Verrecchia*, 196 F.3d 294, 299 (1st Cir.1999)).

**C.   Wire Fraud/Money Laundering**

   Fields also sought acquittal on Count 29, which charged him with wire fraud and money laundering, 18 U.S.C. § 1957.  Section 1957 prohibits monetary transactions in "property constituting,

23

or derived from, proceeds obtained from a criminal offense."
The charge is premised on a January 2006 transfer from the fake
Winn Family Trust to Omni Data in the amount of $600,000, which
was derived from the earlier fraudulent transfer of $650,000
from LocatePlus to the Trust.

### 1. Proceeds

Fields argues that the $600,000 transfer from the Winn
Trust to Omni Data did not qualify as "proceeds" for purposes of
the statute.  The Supreme Court, in *United States* v. *Santos*, 553
U.S. 507 (2008), determined that "proceeds" must mean "profits"
rather than merely "receipts" of criminal activity.  *Id.* at 511-
14 (plurality op.).[4]  Fields argues that the $600,000 transfer
from the Winn Trust to Omni Data cannot be considered "profits"
of criminal activity because the $600,000 was eventually paid
back into LocatePlus where it was recorded as revenue.

Fields is correct that the round-trip revenue recognition
scheme did not generate profits, and thus could not serve as the
predicate criminal activity for money laundering.  But the
government charged wire fraud as the predicate criminal

---

[4] In 2009, Congress amended the money laundering statutes so that
"proceeds" would include "gross receipts."  *See* 18 U.S.C.
§ 1956(c)(9).  However, those amendments were not made
retroactive and are thus inapplicable here.  *See* Fraud
Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123
Stat. 1617 (2009).

activity--specifically, the fraudulent transfer of funds from

LocatePlus to the Winn Trust--which delivered $650,000 into a

bank account owned and controlled by Fields.  The subsequent

transfer of $600,000 from the Winn Trust to Omni Data then

constitutes the monetary transaction using criminally-derived

profits.  Although Fields complains that the government has

"split artificially" the revenue recognition scheme, *Santos*

noted that the government may be able to avoid complications in

establishing the "profits" of overarching criminal activity by

instead charging the "underlying crimes."  *Santos*, 553 U.S. at

521 (plurality op.).  It did so satisfactorily here.

Finally, Fields suggested that the revenue recognition

scheme shows that Fields did not intend to deprive LocatePlus of

money.  But the initial transfer from LocatePlus to the Winn

Trust was no less a scheme "for obtaining money or property by

means of false or fraudulent pretenses," 18 U.S.C. § 1343, and

even a temporary deprivation of property was sufficient to

constitute the predicate wire fraud.  *See United States* v.

*Males*, 459 F.3d 154, 158 (2d Cir. 2006).

2.  Knowledge

Fields also argued the government failed to show he knew

about the initial illegal transfer of $650,000 from LocatePlus

to the Winn Trust, and also failed to show his involvement in

the later transfer to Omni Data.  But Fields had opened the bank

25

account for the non-existent Winn Trust the day before the
transfer from LocatePlus.  He thus at least would have had to
provide routing information for the account to whoever else
might have wired the money, and he would have known there was no
legitimate purpose for wiring money to a fake trust.  Moreover,
Fields had exclusive control over the accounts for the Winn
Trust and Omni Data, ruling out any possibility that he was
uninvolved in the $600,000 transfer between those accounts.  A
reasonable jury could infer that Fields at least knew about the
initial wire fraud and made the subsequent monetary transaction
using the proceeds of that fraud.

## IV. MOTION FOR NEW TRIAL

As an alternative to acquittal or dismissal, Fields sought
a new trial under Fed. R. Crim. P. 33.  I may vacate a judgment
and grant a new trial "if the interest of justice so requires."
Fed. R. Crim. P. 33(a).  The First Circuit has cautioned that
"[t]he remedy of a new trial must be used sparingly, and only
where a miscarriage of justice would otherwise result."  *United
States* v. *Conley*, 249 F.3d 38, 45 (1st Cir. 2001) (citation
omitted).

### A.   *Prosecutorial Misconduct*

Fields argued that the alleged misconduct of AUSA Wild--
discussed in Part II.A, above--warrants a new trial at which
O'Riordan is not permitted to testify.  Fields, however, was

aware of all of the relevant circumstances prior to trial; he had - and took - a full and fair opportunity to cross-examine O'Riordan.  Nothing else about the alleged misconduct affected the trial itself, let alone to an extent that would warrant granting a new trial.

**B.    *Improper Evidence***

   1.  LocatePlus Stock Price Chart

Fields sought a new trial based on the allegedly erroneous admission of a chart of LocatePlus trading activity, which showed a spike in stock price and lower trading volume between December 2005 and December 2006.  Fields claims that the chart was misleading, given that the price spike was attributable to a reverse stock split rather than any misconduct by Fields or his co-conspirators.  He relies on *United States* v. *Ferguson*, 676 F.3d 260 (2d Cir. 2011), where the Second Circuit found a stock price chart--admitted to demonstrate the materiality of charged misconduct by showing a drop in stock price--sufficiently prejudicial to warrant a new trial.

In *Ferguson*, however, the relevant changes in stock price were likely attributable, at least in part, to misconduct unrelated to that charged in the indictment.  *Id.* at 274. Defendants were thus unable to rebut the implications of the chart without introducing other highly prejudicial evidence. And although defendants sought to avoid the problem by

27

stipulating to materiality, the government refused. *Id.*

Fields was in no such bind here.  He had a fair opportunity to explain the price spike.  *Cf. United States* v. *Romano*, 859 F. Supp. 2d 445, 463-64 (E.D.N.Y. 2012) (distinguishing *Ferguson* for this reason, among others).  The government, for its part, actually agrees that the spike was attributable to a reverse stock split, and merely introduced the chart to show that LocatePlus stock was continuously traded during the relevant period.  The government also emphasizes that it was not alleging a "pump and dump" scheme of LocatePlus stock, such that the sudden spike would have been relevant.  Consistent with these representations, the government did not inquire into the spike, and did not even mention the chart in closing.  Introduction of the chart thus did not result in prejudice to Fields that would warrant a new trial.

### 2.   Testimony of Randy Jurecka

Again relying on *Ferguson*, Fields argued that the testimony of investor Randy Jurecka was a prejudicial attempt by the government to "humanize" the prosecution.  *Cf. Ferguson*, 676 F.3d at 274.  Jurecka, however, was called to show the materiality of false statements regarding the dealings between LocatePlus and Omni Data.  Based at least in part on those false statements, Jurecka made substantial investments in LocatePlus. The government faced the burden of proving materiality, 17

C.F.R. § 240.10b-5, because, in contrast to *Ferguson*, Fields had refused to stipulate to materiality.  In any event, the government did not "unfairly emphasize loss."  *Romano*, 859 F. Supp. 2d at 463.  Jurecka may have helped put a human face on the consequences of the alleged crime, but the government did not unduly appeal to sympathy by riffing on lost retirement accounts or college funds.  *Cf. Ferguson*, 676 F.3d at 274. Jurecka's testimony resulted in no miscarriage of justice.

## C.   *Aiding & Abetting Instruction*

Fields next argued that I gave an inadequate instruction on "aiding and abetting," 18 U.S.C. § 2.  He again relies on *Ferguson*, but the relevant part of that case dealt with the trial court's inadequate explanation of "willfully causing" liability under 18 U.S.C. § 2(b).  *Ferguson*, 676 F.3d at 275-76. My instruction outlined the elements of "aiding and abetting" liability under 18 U.S.C. § 2(a), which is an alternative way of establishing accessory liability.  *See generally United States v. Tarr*, 589 F.2d 55, 59 (1st Cir. 1978).  There was no need to provide further instruction distinguishing 18 U.S.C. § 2(b) — an undertaking which, if anything, might have unnecessarily confused the jury.  In fact, my instruction largely tracked the instruction requested by Fields.  There was no error, let alone one that would warrant a new trial.

### D.   *Reliance Instruction*

Fields also claimed error in my refusal to instruct the jury that reliance was a required element of securities fraud. Reliance is a requirement in private securities fraud cases, based on the statutory "loss causation" requirement, 15 U.S.C.A. § 78u-4(b)(4), and judicial importation of the standards for "common-law deceit and misrepresentation actions," *see Dura Pharmaceuticals, Inc*. v. *Broudo*, 544 U.S. 336, 343 (2005).

But neither Section 10(b), 15 U.S.C. § 78j(b), nor Rule 10b-5, 17 C.F.R. § 240.10b-5, includes a reliance requirement. Rather, the statute and rule broadly "prohibit the employment of manipulative and deceptive devices in connection with the purchase or sale of securities." *United States* v. *Haddy*, 134 F.3d 542, 549 (3d Cir. 1998). The statutory scheme thus reflects Congressional judgment that the standards for private securities litigation "are poorly suited to public enforcement actions." *S.E.C.* v. *Tambone*, 597 F.3d 436, 447 (1st Cir. 2010). In the public enforcement context, the aim of preventing deceptive acts that would have "deleterious effect[s] on the integrity of the securities market and on investor confidence . . . obviates the necessity of identification of a specific victim who acted upon the deception." *Haddy*, 134 F.3d at 550. Consistent with these considerations, the SEC is not required to prove reliance when it brings an action under Rule 10b-5.

*Tambone*, 597 F.3d at 447 n.9.  Neither, I conclude, is the United States Attorney required to prove reliance in a criminal prosecution.

Fields cites *United States* v. *Schlisser*, 168 F. App'x 483 (2d Cir. 2006), to support his argument that reliance is a required element of the offense.  But *Schlisser* is of little assistance given that the Second Circuit expressly declined to reach the issue.  *See id.* at 487 ("We need not, however, decide whether actual reliance is a required element for criminal violations of 10b. . . .").

Because reliance is not an element of a criminal securities fraud prosecution under either § 10(b) or Rule 10(b) thereunder, there was no error in the instruction, and there is thus no ground for a new trial.

**E.   *Juror Misconduct***

Finally, Fields sought leeway to explore potential juror misconduct.  On November 21, 2012, attorney Pollack received a notification on the professional networking site LinkedIn that his profile had been viewed by someone from the company at which a juror worked.  Pollack has no affiliation with other employees at the company who might have viewed his profile.  The concern, however, is that the notification indicated this person had viewed Pollack's profile "more than 2 days ago," and the jury returned its verdict on November 19, 2012.  Fields seeks to

31

subpoena LinkedIn to determine who precisely viewed his profile, and whether the viewing occurred before the verdict.

"When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial." *United States* v. *Ortiz-Arrigoitia*, 996 F.2d 436, 442 (1st Cir. 1993). This is so even when the potential misconduct comes to light after the verdict. *Cf. United States* v. *Boylan*, 898 F.2d 230, 258 (1st Cir. 1990) ("When a colorable claim of jury misconduct surfaces, the district court has broad discretion to determine the type of investigation which must be mounted."). Going so far as to interview jurors, however, should only occur when "there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." *United States* v. *Connolly*, 341 F.3d 16, 34 (1st Cir. 2003) (internal quotation and citation omitted).

Here, any impropriety is fundamentality speculative, because even if the viewer was a juror, the notification is not necessarily inconsistent with the juror having viewed Pollack's profile after the verdict was returned.

Perhaps more importantly, there is no evidence of prejudice resulting from these activities. Fields says that Pollack's

LinkedIn page included a link to an article he wrote on
securities fraud, which discusses potential trial and jury
strategies.  But at this point, the argument fully enters the
realm of speculation--not only that a juror viewed the profile
before the verdict, but also that he sought out and read the
relevant article (among many listed on Pollack's profile), and
specifically a part of the article that might have revealed
trial strategies employed in this case, and that such reading
would have made those strategies significantly less effective or
somehow turned the juror against Fields.  Moreover, there is no
indication of jurors searching the internet for extraneous
material on the substance of the case--a subject as to which I
admonished the jury repeatedly over the course of the trial.

     For what it is worth, AUSA Lelling checked his own LinkedIn
profile on November 28, 2012, which reflected that the same
juror had accessed his profile "within the last 30 days."  This
circumstance suggests as the most plausible explanation
favorable to the defendant that a juror went home after
returning the verdict and decided he or she wanted to know a bit
more about the attorneys with whom he or she had just spent a
significant portion of the last four weeks.

     In the absence of a stronger and non-speculative proffer of
a compelling explanation of the prejudice that could have

stemmed from viewing those profiles, I declined to sponsor the requested foray.

## V. CONCLUSION

For the reasons set forth more fully above:

A.    the motion for judgment of acquittal (Dkt. No. 354) was GRANTED IN PART as to Count 28 (Aggravated Identity Theft), and the motion for judgment of acquittal was otherwise DENIED;

B.    the motion to dismiss for due process violations (Dkt. No. 351) was DENIED; and

C.    the motion for a new trial (Dkt. No. 356) was DENIED.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE